[No. 2232.]

## The Wedge Mines Company v. The Denver National Bank.

**1. Principal and Agent—Bills and Notes—Indorsement—Authority of Agent.**

Plaintiff, a mining company, was engaged in mining and shipping ore to a smelting company. The smelting company for each shipment would mail to plaintiff a check drawn upon defendant. Plaintiff's bookkeeper, who received these checks, was authorized to indorse them in blank and deposit them to plaintiff's credit in plaintiff's bank. Defendant had no knowledge of the limitation upon the authority of the agent to indorse the checks only when deposited for plaintiff's credit. Plaintiff's said agent continued to indorse these checks, amounting to several thousand dollars per month, for nearly a year and a half, and during all that time the books were properly kept and upon inspection would have disclosed any discrepancy between the value of ore shipped and the amount deposited to plaintiff's credit. Upon presentation of the checks to defendant they were paid and charged to the smelting company. Plaintiff's said agent indorsed and cashed a number of these checks for his own use and appropriated the money, which checks defendant also paid. Held, that defendant was not liable to plaintiff for the checks thus appropriated by plaintiff's agent, and that the fact that such checks were indorsed by other persons in blank following the indorsement by the agent for plaintiff while the checks deposited in bank to plaintiff's credit were indorsed only by said agent would not charge defendant with notice of the limitation upon the agent's authority.

**2. Bank Checks—Negotiable Instruments—Indorsement—Suspicious Circumstances—Good Faith.**

A bank check is a negotiable instrument and an indorsee of such check is presumed to have received it in good faith, and it will not be invalidated in the hands of such indorsee by suspicious circumstances attending its indorsement unless the circumstances are sufficient to show that it was taken in bad faith.

3. **Appellate Practice—Findings of Fact—Nonsuit.**

Where trial is to the court, if after hearing plaintiff's evidence it is of opinion that plaintiff has not made a case, there is no occasion to require evidence from defendant; and the court's conclusions of fact, made upon a motion for nonsuit, are as binding upon the appellate court as if made after hearing the testimony of both sides.

*Appeal from the District Court of Arapahoe County.*

Mr. Charles H. Toll and Mr. D. V. Burns, for appellant. Mr. R. T. McNeal, of counsel.

Mr. Stuart D. Walling, for appellee.

Gunter, J.

January, 1897, appellant corporation was organized and began business, consisting of operating its mines at Ouray, this state, and marketing the ore mined with The Omaha and Grant Smelting Company, in this city. J. B. Farish, residing here, was president, and Edward Richards was secretary, treasurer, and general manager, residence Salt Lake City. Mr. Richards gave attention to the practical management of the company, and visited its offices in this city monthly during the occurrence of events involved in this action. Mr. Farish was absent from the city during much of the time, but was frequently consulted by Mr. Richards concerning the affairs of appellant. January, 1897, appellant opened its principal office in this city. A room adjoining the office was occupied by Mr. Farish as his private office, his clerk being a niece, Miss M. L. Farish. Appellant, as stated, sold its ore to The Omaha and Grant Smelting Company. After the value of the ore sold was fixed, by sampling and adjustment, a check therefor was mailed to appellant, drawn by the smelting company on appellee bank, and payable to the order of appellant. From January, 1897, to August, 1897,

these checks were indorsed either by Miss Farish in this form: "The Wedge Mines Co., Per M. L. F." (her initials), or by Mr. Richards, thus: "The Wedge Mines Co., Per Ed. Richards," and placed to the credit of appellant with The First National Bank of this city. The checks then passed through the clearing house, were paid by appellee and charged to the account of the smelting company, which company carried its account with appellee.

April, 1897, George E. Peck, an old schoolmate and life-long friend of Farish, and until then a resident of California, was employed by appellant and placed in charge of its above office. Peck's duties were to keep a ledger, journal, bullion and ore sales book, cash book, and to attend to the adjustment of the value of the ore shipped by appellant to the smelting company. These books were kept by Peck correctly during the transactions here involved. The value of the ore sold amounted to several thousand dollars per month, and from August, 1897, to January, 1899, to about $223,000.00. When the value of the ore had been adjusted, the smelting company delivered to Peck personally, or mailed to the company at its Denver office, a statement of its weight and value. A copy of this statement was also sent to Mr. Richards and Mr. Farish, whereby they could know what the ore sales amounted to, and what sum ought to be placed to the credit of appellant in its depository, The First National Bank. Peck entered in the ore and bullion sales book a statement of the amount and value of the ore thus sold. Convenient opportunity for information was thus given at all times to the officers of the company, Farish and Richards, as to the amount of the sales, by this book, in addition to the smelter statements sent them. The cash book, which was balanced monthly, disclosed the amount of cash which should have been to the credit

of appellant in its bank. A comparison of this book, or the ore-sales book, or the smelter statements with the bank pass-book, would have revealed any discrepancy between the checks received by Peck and those deposited. Miss Farish left the office in August, 1897. Peck was thereafter authorized to indorse all checks "The Wedge Mines Co. Per Peck," and to deposit them, so indorsed, to the credit of appellant with The First National Bank of Denver. Such indorsements began with August, 1897, and continued until January, 1899, when appellant first discovered Peck's defalcations. These checks, which were many, and, as stated, amounted to several thousand dollars per month, having received the blank indorsement by Peck, were deposited by him to the credit of appellant, passed through the clearing house to appellee bank, were paid and charged to The Omaha and Grant Smelting Company's account on its books. It had been agreed between Farish and Richards that whenever the cash balance in bank amounted to over $20,000, a dividend should be declared, and dividends were declared almost monthly on such cash balances during these transactions. This is mentioned as bearing upon the opportunity appellant had for ascertaining, by examination of its accounts, defalcations practiced by Peck. During the time of the transactions here involved, Peck was authorized to indorse the checks payable to appellant, "The Wedge Mines Co. Per Peck"; appellant knew that Peck was indorsing its checks in such manner, that upon such indorsement they were being paid, and during all of this time, by such course of dealing, it held Peck out to appellee bank as authorized to so indorse these checks. It had knowingly permitted appellee to pay about $70,000 of such checks so indorsed when Peck appropriated for his own use the first check here sued upon. True it is, that there was a secret limitation upon

the authority given to Peck by authorizing him to make such indorsement. That limitation was, the check so indorsed should be deposited to the credit of appellant at The First National Bank of Denver, but of this limitation appellee had no notice.

December 24, 1897, the smelting company mailed its check payable to the order of appellant and drawn on appellee bank for $685. Peck being in charge of appellant's office and authorized to do so, received the check and indorsed thereon "Wedge Mines Co. Per Peck," and delivered it for value to one Ellis, who indorsed it for value to W. W. Watson, who, after indorsement by him, deposited it to his credit with appellee. This check was charged by appellee to the smelting company and Watson's account was credited with it. The indorsements appearing upon the check when paid by appellee were "Wedge Mines Co., Per Peck, J. K. Ellis, W. W. Watson." Peck negotiated the check for his private use. January, 1899, appellant discovered this misappropriation, and in April, 1899, instituted the present action. In a count thereof for money had and received, appellant sued appellee for the amount of this check, contending that the indorsement by Peck was unauthorized, and that the facts surrounding the negotiation of this and previous checks were sufficient to put appellee upon notice of the limitation upon Peck's power to indorse. The complaint embraced fifteen other causes of action upon fifteen other checks negotiated by Peck, between December, 1897, and February, 1899, and was to recover about $16,000.00. Trial was to the court, which at the close of evidence for appellant, upon motion of appellee, gave judgment of nonsuit, and therefrom is this appeal.

It is conceded by counsel, if the ruling was correct as to this cause of action, it was as to all. The foregoing facts are those pertinent to this cause of

action. From these facts it appears that Peck had authority to indorse in blank the check in question. The indorsement authorized the drawee to pay the amount of the check to bearer. True, there was a secret limitation upon the authority given through the indorsement. This limitation was that the indorsement was to be used only for depositing the check to the credit of appellant with its above depository. But of this limitation appellee had no notice; on the contrary, it had been advised by the previous course of dealing through other checks, many in number and aggregating a large sum, that the indorsement meant just as it read, that is, authority from the payee, appellant, to the drawee, appellee, to pay the check to bearer. Appellee took the check without knowledge of the limitation on Peck's power to indorse in good faith in the ordinary course of business, and is entitled to be protected by the indorsement receiving its apparent meaning, that is, authority from appellant to pay the amount of the check to the holder thereof.

"The principle which pervades all cases of agency, whether it be a general or special agency, is this: The principal is bound by all acts of his agents within the scope of the authority which he holds him out to the world to possess; although he may have given him more limited private instructions, unknown to the person dealing with him. And this is founded upon the doctrine, that where one of two persons must suffer by the act of a third person, he who has held that person out as worthy of trust and confidence, and having authority in that matter, shall be bound by it. It will be at once perceived, this doctrine is equally applicable to all cases of agency, whether it be the case of a general or of a special agent."—Story on Agency (9th ed.), § 127,

note p. 144; *Kansas City R. R. Co. v. Coal Co.*, 97 Ala. 705.

"An indorsement in blank specifies no indorsee, an instrument so indorsed is payable to bearer, and may be negotiated by delivery."—Negotiable Instruments Act, Session Laws 1897, sec. 34, p. 218.

"Where notes are indorsed in blank to an agent, for a particular purpose, which has been disregarded by him, the principal will be bound to a *bona fide* holder by reason of the general authority implied in the blank, and cannot, against such holder, avail himself of the fact that the agent has exceeded his authority. And it makes no difference in such case that the agent has been guilty of a fraud upon his principal. Such fraud will not make the instruments forgery."—1 Rand. Comm. Pap. (2d ed.), § 390.

Appellant contends that appellee bank received the check under such suspicious circumstances as to put it upon inquiry as to authority of Peck to indorse the check; that such inquiry would have disclosed the absence of authority by Peck to indorse for any other purpose than deposit for credit of plaintiff.

The check is a negotiable instrument. Appellee is presumed to have received it in good faith. The burden of proving that it was paid in bad faith by appellee rests with appellant.—*Boughner v. Meyer*, 5 Colo. 71, 75.

The law favors the free circulation of negotiable instruments. To this end is the rule that they are not invalidated in the hands of an indorsee by merely showing that the transfer was attended by suspicious circumstances. To defeat the instrument in the hands of an indorsee, the suspicious circumstances must be sufficient to show that it was taken in bad faith.

"To constitute notice of an infirmity in the instrument or defect in the title of the person nego-

tiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.''—Negotiable Instruments Act, Session Laws 1897, p. 222.

''If there is nothing upon the face of a negotiable instrument, or in the written indorsement or assignment, to notify the assignee that the instrument was originally given upon an illegal consideration (gambling debts excepted), or obtained through fraud, the assignee who pays the value therefor, and takes the same in good faith before maturity, may recover as against the maker. This is true, even though such assignee be in possession of facts or circumstances sufficient to arouse suspicion in the mind of a person of ordinary prudence; and though he is guilty of negligence in not first following up such information for the purpose of discovering the fraud or illegality to which the suspicious circumstances may seem to point. * * * It (the rule) is founded upon commercial necessity. The untrammeled circulation of these instruments is a matter of supreme importance in the vast field of mercantile transactions. Drafts, bills of exchange and other negotiable instruments take the place of money, and circulate almost as freely. To hold that each assignee must, before accepting them, inquire into each and every suspicious circumstance bearing upon the original execution, or pointing to possible defenses in a suit between the original parties, would produce serious inconvenience to the commercial world.''—*Merchants Bank v. McClelland,* 9 Colo. 608, 610, 13 Pac. 723; *Coors v. German National Bank,* 14 Colo. 202, 23 Pac. 328.

There were no circumstances attending the cashing of the check which justified the conclusion that it

was taken by the appellee in bad faith. The presumptions are to the contrary. Further, this case was heard to the court. It was judge of the facts. If, after hearing the evidence for plaintiff, it was the opinion that the circumstances were not such as to put the defendant upon notice, there would be no occasion to call for a defense through further evidence, and by its conclusion upon the facts we are bound. When the case is summed up, it amounts to this: Peck had authority to indorse in blank the check. Such indorsement was authority to pay the amount thereof to bearer. This check was indorsed in blank. Appellee paid it in good faith to bearer. There was a secret limitation upon the use to be made of the indorsement. Of this appellee was without notice. By a long course of dealing appellant held Peck out to appellee as authorized to indorse in blank checks payable to it. Appellee paid this check in good faith upon the authority, through the indorsement of appellant, and is protected in so doing. This conclusion, supported, as we think, by the authorities, is just. Appellant selected Peck, and trusted him with the power to make the indorsement through which fraud was perpetrated. It advised appellee by a course of dealing that Peck had authority to indorse its name in blank. It should suffer the consequence, and not appellee, who was not responsible for his selection, was not responsible for his holding out, and was itself without fault.

It being unnecessary to this decision, we express no opinion as to whether the complaint stated facts sufficient to constitute a cause of action.

Judgment affirmed.

*Affirmed.*